1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES  DISTRICT COURT

## Northern District of California

### San Francisco Division

JERROLD ROSENBLATT,

              Plaintiff,

    v.

CITY OF HILLSBOROUGH, former
HILLSBOROUGH POLICE CHIEF MATT
O'CONNOR, HILLSBOROUGH POLICE
SERGEANT AHERNE, and DOES 1 through
10,

              Defendants.

_____/

No. C 12-05210 LB

**ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

[Re: ECF No. 43]

## INTRODUCTION

In this civil rights action alleging claims under 42 U.S.C. § 1983 and California state law,

Plaintiff Jerrold Rosenblatt asserts that Sergeant Patrick Aherne of the Hillsborough Police

Department ("HPD") used excessive force when he tased him.  *See* Second Amended Complaint

("SAC"), ECF No. 30.[1]  He also asserts that the City of Hillsborough ("City") and Matt O'Connor,

then Chief of the HPD, are liable for Sergeant Aherne's acts under *Monell v. Department of Social

Services*.  *Id.*  Sergeant Aherne, Chief O'Connor, and the City move for summary judgment, arguing

the following:  (1) the force used against Mr. Rosenblatt was reasonable; (2) Sergeant Aherne is

entitled to qualified immunity; and (3) the City and the Chief are not liable under *Monell*.  The court

_____

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
generated page numbers at the top of the document.

1   denies the motion for summary judgment.

2                                    **STATEMENT**

3   **I.  BACKGROUND FACTS[2]**

4        On August 20, 2011, Plaintiff Jerrold Rosenblatt, age 64, lived in Hillsborough, California, with

5   his wife, Carol Rosenblatt, and Nathaniel Rosenblatt, his 19 year-old son from a previous marriage.

6   *See* Snell Decl., Ex. 4 ("Rosenblatt Dep."), ECF No. 54-7 at 3-5, 23-24.  Mr. Rosenblatt was

7   approximately 5' 8" and weighed about 160 pounds.  *Id.* at 17.

8        At 9:53 p.m. on August 20, 2011, Mrs. Rosenblatt called 911 to report that Mr. Rosenblatt and

9   Nathaniel were having a major altercation, a "violent, verbal altercation," and that Nathaniel had

10  sent her a threatening text message saying, "You may never be disrespectful to my friends if you do

11  not wish to be hit . . . I will beat you for no reason at all.  I was gone for a while but now I'm back.

12  Bitch, don't you ever do what you did to Sarah again."  *See* Dep. of Carol Rosenblatt ("Mrs.

13  Rosenblatt Dep.") at 11, Vucinich Decl. Ex. 5, ECF No. 46-5 at 5; Snell Decl. Ex. 5, ECF No. 54-8

14  (Transcript of 911 call).

15       **A.  Initial Police Response**

16       Officer Steven Tharp and Corporal David Young of the Hillsborough Police Department were

17  immediately dispatched to the Rosenblatt residence to investigate.  JSUF #1.  HPD Sergeant Aherne

18  joined them later.  Sergeant Aherne was 42, 5' 10", and 220 pounds, and Officer Tharp was 45, 5'

19  10", and 290 to 295 pounds.  Aherne Depo. at 22-23, 28; Tharp Depo. at 20, 12.  The 911 dispatcher

20  told the police the call was for a "415 Domestic.  It'll be at 199 Ridgeway.  It's, uh, Rosenblatt

21  residence.  The RP is a mother.  Advises a verbal between father and, uh, adult son, pending

22  physical."  Snell Decl. Ex. 5, ECF No. 54-8 at 3.  Officers Tharp and Young arrived at the

23  Rosenblatt home at 10:01 p.m.  Officer Tharp found Nathaniel Rosenblatt backing out of the

24

25  _____

26       [2]  The following facts are taken from the Joint Statement of Undisputed Facts, ECF No. 45,
    and the evidence submitted in support of the parties' summary judgment briefs.  Where necessary
27  for context, the court cites to the evidentiary record but these facts do not factor into the court's
    analysis.  The court identifies the disputed material facts and draws all reasonable inferences in the
28  light most favorable to Mr. Rosenblatt (the non-moving party).  *See Matsushita Elec. Indus. Co. v.
    Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

ORDER (C 12-05210 LB)                    2

UNITED STATES DISTRICT COURT
For the Northern District of California

1   driveway.  JSUF #2.  Tharp was familiar with Nathaniel from previous encounters.  JSUF #6.[3]

2   Aherne remembered that Nathaniel had been violent with officers before, spitting on an officer at

3   one point.  Aherne Depo. at 42-43.

4       When they arrived, Tharp partially blocked the driveway with his vehicle and asked Nathaniel to

5   step out of the car.  JSUF #3.  When Corporal Young arrived on the scene, he asked Nathaniel to sit

6   on the ground, and Nathaniel complied.  JSUF #5.  Officer Tharp approached the Rosenblatt

7   residence, while Corporal Young remained with Nathaniel.  JSUF #4.  Tharp approached the

8   residence and knocked on the door several times.  JSUF #7.

9       Mr. Rosenblatt was in the kitchen when he heard the police ring the doorbell.  He was not aware

10  of their presence until then.  JSUF #8.  After Mr. Rosenblatt opened the door slightly, Officer Tharp

11  explained to him that the police were there as a result of a 911 call about an argument between Mr.

12  Rosenblatt and his son.  JSUF #9.  Officer Tharp saw a cut on Mr. Rosenblatt's forehead.  Mr.

13  Rosenblatt stated that the cut was from bumping his head.  JSUF #10.

14      Officer Tharp asked to speak with Mrs. Rosenblatt, and Mr. Rosenblatt said she was upstairs and

15  that he would go get her.  JSUF #11-12.  Mr. Rosenblatt closed the front door with Officer Tharp

16  outside and went upstairs to get his wife.  JSUF #13.  It took Mr. Rosenblatt a couple of minutes to

17  get his wife from upstairs, and Officer Tharp began knocking on the front door.  JSUF #14.

18      Mr. Rosenblatt opened the front door again, and Tharp could see another person behind him.

19  JSUF #15-16.  Mr. Rosenblatt said that everything was okay, while a female voice responded that

20  she could speak for herself.  JSUF #17.  The female identified herself as Carol Rosenblatt, and as

21  Officer Tharp tried to speak with her through the open doorway, Mr. Rosenblatt kept interjecting

22  until Mrs. Rosenblatt stated that she could speak for herself.  JSUF #18.

23      Officer Tharp entered the home because, based on his training and experience, he believed that

24  there may have been a domestic violence incident and he felt it was necessary to keep the

25  Rosenblatts in view.  JSUF #19.  Officer Tharp was standing in the foyer, just at the edge of the

26  dining room for a few minutes while he waited for back-up.  JSUF #22.  While Officer Tharp was

27

28          [3]  Those encounters apparently involved verbal altercations between father and son.  Tharp
        Depo. at 31.

ORDER (C 12-05210 LB)                    3

UNITED STATES DISTRICT COURT
For the Northern District of California

1   standing there, he heard Mr. Rosenblatt trying to dissuade Mrs. Rosenblatt from speaking with

2   Officer Tharp or providing information.  JSUF #21, 23.

3   **B. Sergeant Aherne Arrives**

4       Defendant Sergeant Patrick Aherne arrived at the scene.  JSUF #25.  Aherne was wearing a

5   Hillsborough Department issued audio recording device.  JSUF #25.  While exiting his car, Aherne

6   activated the audio recorder because he was responding to a family dispute with possible domestic

7   violence.[4]  JSUF #25.  Outside the front door, Officer Tharp updated Aherne on the situation at the

8   Rosenblatt residence.  JSUF #24.

9       According to the transcribed audio recording, Sergeant Aherne told Officer Tharp, "you need to

10  interview, female.  OK."  Audio Transcription, ECF No. 54-9 at 5.  Officer Tharp agreed and then

11  told Mr. Rosenblatt that he was going to talk to Mrs. Rosenblatt.  *Id.*  He asked "Mr. Rosenblatt, can

12  you please step outside.  Mr. Rosenblatt, please step outside."  *Id.*  Mr. Rosenblatt objected, stating

13  "you're here, all on my good graces right now.  So I appreciate you trying to tryin' to help, but . . . ."

14  *Id.*  Sergeant Aherne interrupted Mr. Rosenblatt and the following discussion took place:

15  Sergeant Aherne:  No. You don't understand something. There was a 911 call.

16  Mr. Rosenblatt:    I understand that.

17  Sergeant Aherne:  We have to make sure everybody's okay.  A crime occurred, so we're not
                            here just because of your good graces.
18
    Mr. Rosenblatt:    Okay, but a crime, a crime didn't occur.
19
    Sergeant Aherne:  But we don't know that.  That's why we need to interview everybody
20                           here.

21

22

---

23  [4] A DVD with the audio recording was later placed into evidence by Officer Tharp.  JSUF
    #25.  The parties provided the court with a copy of the DVD, and the court listened to the recording.

24  *See* Serrato Decl. Ex. 1, ECF No. 50-1.  In opposition to the summary judgment motion, Mr.
    Rosenblatt submits a transcript of Sergeant Aherne's audio recording prepared by Plaintiff's audio

25  expert Dr. Durand Begault.  *See* Snell Decl., ECF No. 54-1, ¶ 6; Snell Decl. Ex. 5, ECF No. 54-8
    ("Audio Transcript").  In their reply, Defendants state that "[r]esort to experts to state what is in the

26  audio recording is unnecessary because it speaks for itself" but they do not object to the transcript
    and do not dispute its accuracy.  Reply, ECF No. 55 at 9.  The court find the transcript helpful and

27  cites it in this order.  The court listened to the tape and confirmed that (at minimum) a reasonable
    juror could conclude that the cited portions are accurate transcriptions of the recorded audio.  The

28  audio is not perfect but one can hear what the transcript conveys.

ORDER (C 12-05210 LB)              4

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    Mr. Rosenblatt:    There's hasn't been a crime here.

2    Sergeant Aherne:    You're saying that.  And I'm saying I'm not sure.

3    Mr. Rosenblatt:    Okay.  I understand that.

4    Sergeant Aherne:    So. If, we, He can stay here, but if somebody else would like to report a crime and – that would be – I'll have to do that – goes as soon as we
5                      determine there's no crime.

6    Mr. Rosenblatt:    Okay. There hasn't been a crime. Okay.

7    Officer Tharp:    So that's what you're saying sir. It doesn't help if, with you sitting here, and constantly interjecting or interfering when we're trying to talk to
8                      somebody. Okay?

9    Sergeant Aherne:    So witness intimidation is also a crime.

10    *Id.* at 5-6.

11      Officer Tharp then asked Mrs. Rosenblatt if she wanted to go outside.  *See* JSUF #28; Audio

12 Transcript at 5-6.  She told him she did not want to go out front because that is where her stepson

13 Nathaniel was.  JSUF #28.  Tharp and Mrs. Rosenblatt then went out onto the back patio to speak.

14 JSUF #29.  Mrs. Rosenblatt showed Officer Tharp a text message from Nathaniel Rosenblatt that

15 read:

16      you may NEVER be disrespectful to my friends if you do not wish to be hit And if you had ANYTHING to do with my father's new rule, I will beat you for no reason at all.  I was gone
17      for a while, but now I'm back, bitch.  Don't you EVER do what you did to Sara again.

18 JSUF #33.

19      Meanwhile, Sergeant Aherne and Mr. Rosenblatt continued to talk.  Sergeant Aherne advised

20 Mr. Rosenblatt that if he continued to interfere with the officers' investigation, he would be arrested.

21 JSUF #30.  Sergeant Aherne's audio recording (and the transcript) indicate that Aherne again

22 warned Mr. Rosenblatt that he would be arrested if he "continue[d] to interfere with our

23 investigation.  Even if you may be a victim.  We have a job to do.  And I'm asking you very nicely

24 to please let Officer Tharp conduct this investigation."  Audio Transcript at 7.  Mr. Rosenblatt

25 responded that he appreciated the police coming out and that everything was under control.  *Id.*

26 Sergeant Aherne said that he didn't think so and that "I think you don't understand that once we get

27 called we have an obligation to investigate a crime.  Now . . . right now you're interfering with his

28 [Officer Tharp's] ability to investigate a criminal investigation."  *Id.*  Mr. Rosenblatt again

UNITED STATES DISTRICT COURT
For the Northern District of California

1  responded that there was not a crime.  *Id.*  Mrs. Rosenblatt's voice can be heard saying that she was

2  the one who was threatened, and then Sergeant Aherne told Mr. Rosenblatt to "go back inside."  *Id.*

3  Mr. Rosenblatt then addressed his wife:

> Mr. Rosenblatt:  Carol, Carol, Carol.

> Mrs. Rosenblatt:  I don't even care.

> Unidentified Male:  Will you stop.

> Sergeant Aherne:  Sir, go back inside your house, that's not a request.

> Mr. Rosenblatt:  Carol.

> Sergeant Aherne:  If you want to wind up in handcuffs and go in a police car to jail tonight

> Mr. Rosenblatt:  Carol, uh.  Please stop this now Carol.

11  *Id.* at 5-6.  Sergeant Aherne told Mr. Rosenblatt, "This is the last time I'm going to tell you.  Is there

12  anything I can say or do to get you to comply with my lawful order?"  JSUF #32.  Mrs. Rosenblatt

13  then spoke with Officer Tharp.  While she did that, Mr. Rosenblatt walked through the house with

14  Sergeant Aherne to the front entryway.  JSUF #34.  Sergeant Aherne walked outside the front door

15  while continuing to speak with Mr. Rosenblatt.  JSUF #35.  Sergeant Aherne then said "Thank you"

16  and "Sir, here's my card.  If you would like to make a complaint or anything else.  I know this is

17  very difficult and I'm sorry that we had to meet in these circumstances, family matters are very

18  difficult.  Transcript at 7.  Sergeant Aherne then asked Mr. Rosenblatt to leave the front door open.

19  JSUF #36.

20  Mr. Rosenblatt then closed the front door and walked into the dining room and over to the patio

21  doorway.  JSUF #37-38.  Mr. Rosenblatt testified that he went to the patio because he wanted to

22  make sure his wife was okay.  Mr. Rosenblatt Depo. at 99-100, Snell Decl. Ex. 4, ECF No. 54-7 at

23  24-25.  Defendants claim that Mr. Rosenblatt came to the back door and told Officer Tharp that he

24  needed to leave the house and that he lacked permission to be there.  Tharp Depo. at 65, Vucinich

25  Decl. Ex. 1, ECF No. 46-1 at 26.

26  Officer Tharp told Mr. Rosenblatt "something to the effect of, 'You need to go back inside, sir.'"

27  *Id.* at 66.  (Mr. Rosenblatt testified that he did not go out onto the patio but was inside the door.

28  Rosenblatt Depo. at 100.)  Then Sergeant Aherne came from the side of the house and told Mr.

1   Rosenblatt that he was interfering with the officers in the performance of their duty and he was

2   dissuading a witness from reporting a crime.  *Id.*; JSUF #40.  Sergeant Aherne also told Mr.

3   Rosenblatt to go back inside the house.  JSUF #41.  Mr. Rosenblatt said something unclear to

4   Sergeant Aherne, who responded:

5       You don't make that decision.  Please go back inside your house, sir.  We have been very,
        very patient with you.  I am not going to continue to be so patient if you don't go back inside.
6       you're obstructing or delaying an officer in the performance of his duties, and you're
        intimidating the witness.  If you do not comply, you will be arrested and taken to County jail
7       tonight.  Do you understand that, sir?

8   JSUF #42.  Sergeant Aherne said, "Sir, is there anything I can say, or do, to get you to comply with

9   my lawful order and conduct this investigation and prevent you from interfering with this

10  investigation and intimidating the witness."  JSUF #43.  Sergeant Aherne then ordered Mr.

11  Rosenblatt to go back inside.  JSUF #44.  Mr. Rosenblatt told Sergeant Aherne to leave his house

12  and go back to the police station, stated that he had not committed any crimes that would permit the

13  police to enter his house without his permission, and denied intimidating the witness.  Mr.

14  Rosenblatt Depo. at 103; Audio Transcript at 10-12.  Then Sergeant Aherne said to Mr. Rosenblatt,

15  "Turn around, [scuffling sound/cuffs clinking] put your hands behind your back, you're under

16  arrest."  JSUF #45.  There was this further dialogue:

17      Mr. Rosenblatt:    I'm asking both –

18      Sergeant Aherne:  Turn around –

19      Mrs. Rosenblatt:   Quit [scuffling sound], Jerry [meaning Mr. Rosenblatt] –

20      Mr. Rosenblatt:    Of you to please leave my home.

21      Mrs. Rosenblatt:   Wait/Please –

22      Sergeant Aherne:  Stop resisting, Sir.

23      Mrs. Rosenblatt:   Enough –

24      Sergeant Aherne:  Stop resisting.

25      Mrs. Rosenblatt:   Enough, enough –

26      Sergeant Aherne:  Stop resisting –

27      Mr. Rosenblatt:    What do you think, you're taking me to jail?

28  *See* Transcript at 10-11.

ORDER (C 12-05210 LB)                    7

1    The parties' accounts differ in some respects about what happened here and before Sergeant

2    Aherne tased Mr. Rosenblatt.

3    **C.   Defendants' Version of Events Leading Up to Mr. Rosenblatt's Arrest and Tasering**

4    Defendants contend that as Sergeant Aherne approached Mr. Rosenblatt, Mr. Rosenblatt started

5    backing up.  Tarp Depo. at 68; Aherne Depo. at 119.  Then Officer Tharp approached Mr.

6    Rosenblatt and attempted to grab his wrist in order to put him in a control hold for handcuffing.

7    JSUF #46.  Mr. Rosenblatt then jerked his body, and his hand slipped from Officer Tharp's grasp.

8    Tharp Depo. at 68; Aherne Depo. at 121.  Officer Tharp said that it felt like Mr. Rosenblatt had

9    some kind of lotion on his hands and arm.  Tharp Depo. at 68.  Officer Tharp then placed one arm

10   around Mr. Rosenblatt's chest and grabbed his elbow in order to keep him from getting away.  Tharp

11   Depo. at 68; Aherne Depo. at 122.  Officer Tharp was trying to get Mr. Rosenblatt to go down on

12   one knee, and Mr. Rosenblatt was struggling with him.  Tharp Depo. at 70; Aherne Depo. at 122.  At

13   this point, Sergeant Aherne withdrew his Taser from his holder and pointed it at Mr. Rosenblatt.

14   JSUF #47.  Officer Tharp said that Sergeant Aherne put the laser dot on Mr.  Rosenblatt's chest.

15   Tharp Depo. at 68.  Sergeant Aherne warned Mr. Rosenblatt twice that he would be tased if he did

16   not get down on the ground with his hands behind his back.  JSUF #55.  More specifically, the

17   recording has this dialogue:

18        Sergeant Aherne:  Get down on the ground –

19        Mrs. Rosenblatt:   Jerry –

20        Sergeant Aherne:  Do it right now or I will Tase you.

21        Officer Tharp:       Are you going to cooperate?

22        Sergeant Aherne:  Get down on the ground?

23        Mrs. Rosenblatt:   Jerry, stop it.

24        Sergeant Aherne:  Get down on the ground?

25        Mr. Rosenblatt:    What's he doing, Carol?

26        Sergeant Aherne:  Get down on the ground, put your hands behind your back –

27        Mrs. Rosenblatt:   Jerry, stop it.

28        Sergeant Aherne:  Get down on the ground, put your hands behind your back, or I will Tase you
                             sir.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Mrs. Rosenblatt:   Get on the ground.

2    Sergeant Aherne:  Sir, get down on the ground.  Get down on the ground right now.

3  *See* Transcript at 12.

4    Mr. Rosenblatt's body went limp, and he began to go down on his knees.  Tharp Depo. at 70;

5  Aherne Depo. at 124.  Officer Tharp released Mr. Rosenblatt and went to pull out his handcuffs.

6  JSUF #49.  Just then, Mrs. Rosenblatt got up and ran inside the house to the side of the dining room

7  table.  Tharp Depo. at 73; Aherne Depo. at 55.  Mr. Rosenblatt jumped up and ran in the house after

8  her, and the officers followed.  Tharp Depo. at 75-76.  Mr. Rosenblatt ran into the dining room after

9  Mrs. Rosenblatt, ran to where the table was, and stopped running.  Tharp Depo. at 75-76.  He turned

10  to face Sergeant Aherne as Sergeant Aherne entered the room.  Aherne Depo. at 46-48.  Sergeant

11  Aherne said, "Get down on the ground, put your hands behind your back, or I will Tase you, sir."

12  JSUF #50.  Mr. Rosenblatt then raised his hand towards Sergeant Aherne, leading Sergeant Aherne

13  to believe he was going to be assaulted.  Aherne Depo. at 46-48.

14    Sergeant Aherne then deployed his Taser in dart mode.  One dart stuck into Mr. Rosenblatt's

15  right hand between his ring and middle fingers.  The other dart stuck into his right chest.  JSUF #53.

16  Sergeant Aherne deployed the Taser because he was concerned for the safety of Mrs. Rosenblatt, the

17  safety of all officers involved, Mr. Rosenblatt's ability to get a weapon inside the house, Mr.

18  Rosenblatt's resisting of arrest, and the fluid and volatile situation.  Aherne Depo. at 46, 55.

19  Sergeant Aherne had OC (pepper) spray and a collapsible baton and considered using them but

20  given the time and distance from Mr. Rosenblatt, he would not have been able to draw his baton or

21  pepper spray Mr. Rosenblatt.  *Id.* at 79.  He could have hit or punched him but the Taser seemed like

22  the best option.  *Id.*  Hand-to-hand fighting was not an option because of the positions of everyone

23  and the furniture on the patio.  *Id.* at 80, 82.

24    When Sergeant Aherne tased Mr. Rosenblatt, he fell to the ground.  JSUF #54.  Mr. Rosenblatt

25  was ordered to stay on the ground, but instead he tried to rise to his feet.  Tharp Decl. ¶ 4; Aherne

26  Decl. ¶ 14.  Sergeant Aherne said, "Put your hands behind your back.  I'm going to Tase you again."

27  JSUF #55.  Sergeant Aherne pulled the trigger a second time, but it was ineffective, and Mr.

28  Rosenblatt rolled on the ground and tried to break the Taser wires.  Aherne Depo. at 50; Tharp

1   Depo. at 77.  Officer Tharp forced Mr. Rosenblatt to the ground and handcuffed him.  Tharp Depo.

2   at 77.

3   **D. Plaintiff's Version of Events Leading Up to Mr. Rosenblatt's Arrest and Tasering**

4       Plaintiff's version of the facts follows the same general outline: the officers grabbed him, he got

5   up and entered the dining room, and Sergeant Aherne tased him.  *See* Opp'n, ECF No. 54 at 12.  He

6   also agrees on all the undisputed facts (JSUF) in the previous section and what the audio recording

7   reveals.  But his account differs in key details.

8       First, after Mr. Rosenblatt closed the front door and walked back through the house to the patio

9   doorway, he says he never left the house and instead was standing a foot inside at the patio door.  He

10  was confused by the orders to "get back in the house" because he was already in the house.  Mr.

11  Rosenblatt Depo. at 102, 128.  Thus, he remained standing there.  *Id.*  Then, Sergeant Aherne

12  suddenly grabbed him and yanked him outside onto the patio and started screaming at him to get

13  down.  *Id.* at 105-06.  When Sergeant Aherne grabbed him, Mr. Rosenblatt lost his balance and fell

14  to the ground.  *Id.* at 106.  It is a step down from the house to the patio.  Snell Decl., Ex. 12.  Mr.

15  Rosenblatt felt many hands holding onto him.  Mr. Rosenblatt Depo. at 108.  Then the hands

16  released him.  *Id.*

17      At the same time, Mrs. Rosenblatt heard an officer use the word "tase" and warn her to get out of

18  the way.  *See* Mrs. Rosenblatt Depo. at 34-37.  She saw the officers back away from Mr. Rosenblatt,

19  who was down on his knees.  *Id.*  She then walked into the dining room and walked to the right side

20  of the door.  *Id.* at 38.

21      Mr. Rosenblatt and Mrs. Rosenblatt both testified that Mr. Rosenblatt then got up and walked

22  into the dining room and went straight ahead (not to the right where Mrs. Rosenblatt was).  *Id.* at 37-

23  38; Mr. Rosenblatt Depo. at 109.  When Mr. Rosenblatt reached the dining room table, he was tased

24  in the back as he was walking, and he started screaming.  Mr. Rosenblatt Depo. at 48, 109; Mrs.

25  Rosenblatt Depo. at 37.  The Taser tracks how long it was used for and indicates that Sergeant

26  Aherne held the trigger down for ten seconds.  Clark Depo. at 39, ECF No. 54-12 at 13.[5]

27  _____

28      [5] Sergeant Aherne was trained that a Taser should not be applied for more than five seconds.
    Chinca Depo. at 1, 29.

1    After he was hit by the Taser, Mr. Rosenblatt did not get up from the ground until an officer

2    lifted him off.  Mr. Rosenblatt Depo. at 41.  Nonetheless, Sergeant Aherne tasered him again, this

3    time for five seconds.  Clark Depo. at 39.

4         Roger Clark, the defendants' police practices expert, wrote in his report that the wounds indicate

5    that Mr. Rosenblatt was moving toward the police when he was tased.  Snell Decl. Ex. 11 at 7.  After

6    he was shown a picture of the Rosenblatts' dining room, he said that Mr. Rosenblatt could have been

7    moving away from Sergeant Aherne, with his head and chest turned slightly to the right to get

8    around the dining room table, at the time he was shot.  Snell Decl. Ex. 9 at 80-86; *see* Opposition,

9    ECF No. 54 at 13 (this is consistent with Mr. Rosenblatt's testimony).

10   **E.  After Application of the Taser**

11        Mr. Rosenblatt was then handcuffed by the police, and the paramedics were called.  *See*

12   Recording.  Mr. Rosenblatt was treated by paramedics at the scene and then was transported to San

13   Mateo County Medical Center where the Taser Darts were removed.  JSUF #56.

14        While the paramedics were treating Mr. Rosenblatt, Sergeant Aherne spoke with his supervisor,

15   Captain Mark O'Connor,[6] over the phone in a recorded call and explained what happened.  Aherne

16   Depo. at 131.  In discussing what led up to his using the Taser, Sergeant Aherne told Captain

17   O'Connor, "He tried to go in back inside the house and I Tased him in the back, he falls down, I got

18   medics here treating him now."  Audio Transcript at 25.  More fully:

19        We got called to Rosenblatts' house on 199 Ridgeway. The place where the son spit on [Doug].
         For a 415. [-for] verbal. We get here, Dave and uh, Tharp first and they're talking. The father
20       starts interfering. He says nothing is wrong. He has a cut on his forehead.

21       Tharp starts interviewing the wife and she says she was threatened. The husband, he [starts]
         interfering, so I told Tharp go interview her in the back yard. And [-] leave in the house sir.
22       Whatever. He like locked me out of the front door, I go around to the back, comes out the back
         and tries to intimidate the wife [-] again. She thinks she was threatened. She has text messages.
23       And she was threatened and I ask the guy, I tell him he's interfering with the investigation. I go
         through the whole deal. He won't stop [and --] stop and [-] stop. [Like] sir, you are interfering
24       with our investigation, you are intimidating the witness. If you don't leave, you're going to be
         arrested and uh I ask him every way I know how, it's gotta [be], I think on tape, cuz I was rolling
25       my uh, video recorder.

26       And I, finally he says, you know, no. I say, [you] don't go back inside you're gonna be arrested
         for interfering with an officer and witness intimidation. And he says no. I say ['k] turn around
27

28        ────────────────

          [6] Captain (now HPD Chief) Mark O'Connor is the brother of the Defendant, former HPD
     Chief Matt O'Connor.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   put your hands behind your back. Then the [fight's on]. Between Tharp, him and I. **He tried to**
2   **go in back inside the house and I Tased him in the back**, he falls down, I got medics here
    treating him now. His son is [booked] for 422 for threatening the wife. Stepmother. So we've got
3   him [booked], her [booked] I got Tharp. I mean I've got uh [Paul 9] called in for overtime. If you
    want to come by and assist us with [sittin' on a prisoner or something] that would be greatly
4   appreciated, but you don't have to.

5   Audio Transcript at 24 (emphasis added).[7]  At his deposition, Sergeant Aherne explained that by

6   "fighting," he meant "struggling."  Aherne Depo. at 122.

7       Sergeant Aherne also told Captain O'Connor that when he tased Mr. Rosenblatt, he couldn't

8   remember if Mrs. Rosenblatt was inside or outside.  Transcript of Recording, Ex. 6 at 35.

9       Sergeant Aherne's contemporeanous police report described the incident as follows:

10      Jerry Rosenblatt got up and went by me, through the door into the dining room. I told him to stop
        or I would tase him.  I fired the Taser and Jerry Rosenblatt fell near the entrance to the kitchen.
11

12  Police Report, Snell Decl. Ex. 18 at 3.

13      Mr. Rosenblatt was cited for violations of California Penal Code §§ 136.1(b)(1) and 148(a)(1) at

14  the hospital and released.  JSUF #57.  Mr. Rosenblatt pleaded nolo contendere to a violation of

15  California Penal Code § 415(2), which is disturbing another person by a loud and unreasonable

16  noise.  JSUF #59.  Nathaniel Rosenblatt was arrested for a violation of California Penal Code § 422,

17  threats to a family member.  JSUF #58.

18  **F. Other Relevant Facts Regarding the Use of Force and the *Monell* Claim**

19      Sergeant Aherne served as a San Francisco Sheriff's Deputy beginning in 1993.  JSUF #61.

20  After going through a 10- or 12- week field training officer program, he joined the Hillsborough

21  Police Department in 1997.  JSUF #60, 62.  Sergeant Aherne initially received training on the Taser

22  model he used on Mr. Rosenblatt in 2005 from Corporal Robert Chinca.  JSUF #63.  In 2007,

23  Sergeant Aherne became a Taser Instructor for the Hillsborough Police department after completing

24  a Taser instructor course.  JSUF #64.  He served as a trainer for the HPD until November 2009.  *Id.*

25      After the incident, HPD Captain (and now Chief) Mark O'Connor reviewed the police reports

26  and listened to the audio recording of the incident, the 911 call placed by Carol Rosenblatt, and the

27  dispatch tapes of the incident.  JSUF #68, 69.  He also talked with Sergeant Aherne on the telephone

28

---

[7] The recording tracks the transcript.

1   (as described above).  Based on this review, Captain O'Connor determined that the use of force was

2   appropriate.  O'Connor Depo. at 15.  He also interviewed Sergeant Aherne, Officer Tharp, and

3   Corporal Young regarding the incident.  *Id.* at 20.  When his review was complete, Captain

4   O'Connor confirmed his initial finding that the use of force was appropriate.  *Id.* at 16.  He based

5   this on the fact that after Mr. Rosenblatt continued to intimidate and dissuade Mrs. Rosenblatt from

6   talking with the officers, Sergeant Aherne saw him run into the house behind his wife.  *Id.* at 51.

7   Also, Mr. Rosenblatt resisted arrest and broke away from Officer Tharp.  *Id.* at 17-18.  He reported

8   to former Chief Matt O'Connor that "this was an appropriate use of force based on the recordings,"

9   and the former Chief responded, "okay."  *Id.* at 14-16.

10   **G.  Use of Force Policies**

11   Hillsborough Police Department Policy 309 (adopted on May 31, 2010) sets forth the

12   department's Taser Guidelines.  Section 309.3 of the policy reads as follows:

13   VERBAL AND VISUAL WARNINGS

14   Unless it would otherwise endanger officer safety or is impractical due to circumstances, a
15   verbal announcement of the intended use of the Taser shall precede the application of a
     Taser in order to:

16   (a) Provide the individual with a reasonable opportunity to voluntarily comply.

17   (b) Provide other officers and individuals with warning that a Taser may be deployed. If, after a
18   verbal warning, an individual continues to express an unwillingness to voluntarily comply with
     an officer's lawful orders and it appears both reasonable and practical under the circumstances,
     the officer may, but is not required to display the electrical arc (provided there is not a cartridge
19   loaded into the Taser) or laser in a further attempt to gain compliance prior to the application of
     the Taser.  The aiming laser should never be intentionally directed into the eyes of another as it
20   may permanently impair their vision.

21   The fact that verbal and/ or other warning was given or reasons it was not given shall be
     documented in any related reports.

22

23   JSUF 65.

24   Section 309.4 reads as follows:

25   USE OF THE TASER

26   As with any law enforcement equipment, the Taser has limitations and restrictions requiring
     consideration before its use. The Taser should only be used when its operator can safely
27   approach the subject within the operational range of the Taser. Although the Taser rarely fails
     and is generally effective in subduing most individuals, officers should be aware of this potential
28   and be prepared with other options in the unlikely event of such failure. Authorized personnel
     may use the Taser when circumstances known to the individual officer at the time indicate that

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

the application of the Taser is reasonable to subdue or control:

(a) A violent or physically resisting subject, or:

(b) A potentially violent or physically resisting subject if:

    1. The subject has verbally or physically demonstrated an intention to resist; and

    2. The officer has given the subject a verbal warning of the intended use of the Taser followed by a reasonable opportunity to voluntarily comply; and

    3. Other available options reasonably appear ineffective or would present a greater danger to the officer, the subject or others.

    4. Individuals who have been recently sprayed with alcohol based Pepper Spray or who are otherwise in close proximity to any combustible material.

    5. Passively resisting subjects.

    6. Individuals whose position or activity may result in collateral injury (e.g. falls from height, operating vehicles

    . . . .

(d) While manufacturers have generally recommended that reasonable efforts should be made to target lower center mass and avoid intentionally targeting the head, neck, chest and groin, it is recognized that the dynamics of each situation and officer safety may not permit the officer to limit the application of the Taser darts to a precise target area. As such, officers should take prompt and ongoing care to monitor the condition of the subject if one or more darts strikes the head, neck, chest[.]

JSUF 66.

Section 309.4.1 of the Policy reads as follows:

MULTIPLE APPLICATIONS OF THE DEVICE

If, after a single application of the Taser, an officer is still unable to gain compliance from an individual and circumstances allow, the officer should consider whether or not the probes or darts are making proper contact, or if the use of the Taser is limiting the ability of the individual to comply, or if other options or tactics may be more appropriate. This however, shall not preclude any officer from multiple, reasonable applications of the Taser on an individual.

JSUF 67.

## II. PROCEDURAL HISTORY

On October 9, 2012, Mr. Rosenblatt filed a complaint against Sergeant Aherne, Matt O'Connor, Officer Tharp, and the City.  Original Complaint, ECF No. 1.  He filed an amended complaint in October 2012 and the operative Second Amended Complaint in June 2013.  *See* ECF Nos. 5, 30.  On September 9, 2013, the parties stipulated to dismiss the claims against Officer Tharp.  ECF No. 39.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    In the Second Amended Complaint, Mr. Rosenblatt brings nine claims for relief.[8]  His first claim

2  is against Sergeant Aherne under section 1983 for excessive force in violation of the Fourth

3  Amendment.  ECF No. 30 at 5.  His second claim is against Chief O'Connor for supervisory liability

4  under section 1983.  *Id.*  His third claim is against the City for *Monell* liability.  *Id.*  His fourth

5  through ninth claims are state law tort claims against all Defendants for assault, battery, false arrest

6  and illegal imprisonment, intentional infliction of emotional distress, and negligence.  *Id.* at 6-8.  His

7  tenth claim is against all Defendants for violating the Bane Act, California Civil Code §§ 52, 52.1.

8  *Id.* at 8.  Defendants answered the Second Amended Complaint on July 1, 2013.  ECF Nos. 32-35.

9    Defendants moved for summary judgment, and Plaintiff opposed it.  ECF Nos. 43-50, 54-55.

10  The court heard oral argument on November 7, 2013.

**ANALYSIS**

12  **I. SUMMARY JUDGMENT**

13    A motion for summary judgment should be granted if there is no genuine issue of material fact

14  and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v.*

15  *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those that may affect the

16  outcome of the case.  *Anderson*, 477 U.S. at 248.  A dispute about a material fact is genuine if there

17  is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Id.* at 248-

18  49.

19    The party moving for summary judgment bears the initial burden of informing the court of the

20  basis for the motion, and identifying portions of the pleadings, depositions, answers to

21  interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material

22  fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet its burden, "the moving party

23  must either produce evidence negating an essential element of the nonmoving party's claim or

24  defense or show that the nonmoving party does not have enough evidence of an essential element to

25  carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

26  *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076

27  (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need

28

---

[8]  The SAC does not have an "eighth" claim for relief.

ORDER (C 12-05210 LB)          15

UNITED STATES DISTRICT COURT
For the Northern District of California

1   only point out 'that there is an absence of evidence to support the nonmoving party's case.'")

2   (quoting *Celotex Corp.*, 477 U.S. at 325).

3      If the moving party meets its initial burden, the burden shifts to the non-moving party to produce

4   evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1103.

5   The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence,

6   but instead must produce admissible evidence that shows there is a genuine issue of material fact for

7   trial. *See Devereaux*, 263 F.3d at 1076.  If the non-moving party does not produce evidence to show

8   a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477

9   U.S. at 323.

10     In ruling on a motion for summary judgment, inferences drawn from the underlying facts are

11  viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith*

12  *Radio Corp.*, 475 U.S. 574, 587 (1986).

13  **II.  MR. ROSENBLATT'S EXCESSIVE FORCE CLAIM**

14     The Fourth Amendment to the United States Constitution protects persons against "unreasonable

15  searches and seizures."  U.S. Const. amend. IV.  It is undisputed that Mr. Rosenblatt was "seized"

16  within the meaning of the Fourth Amendment.  Thus, the issue before the court is whether the force

17  used during his seizure was "objectively reasonable."  *Arpin v. Santa Clara Valley Transp. Agency*,

18  261 F.3d 912, 921 (9th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)).

19     "Determining whether the force used to effect a particular seizure is reasonable under the Fourth

20  Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's

21  Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*,

22  490 U.S. at 396 (internal citations and quotations omitted).  To do so, a court must evaluate the facts

23  and circumstances of each particular case, including (1) the severity of the crime at issue, (2)

24  whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether

25  he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396

26  (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).  The most important of these three factors is

27  whether the suspect poses an immediate threat to the safety of the officers or others.  *Id*.  "In some

28  cases . . . the availability of alternative methods of capturing or subduing a suspect [also] may be a

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    factor to consider." *Smith v. City of Hemet*, 349 F.3d 689, 701 (9th Cir. 1994).

2      "The reasonableness of a particular use of force must be judged from the perspective of a

3    reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S.

4    at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)); *see id.* at 396-97 ("'Not every push

5    or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the

6    Fourth Amendment.") (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  This is

7    because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are

8    often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

9    evolving—about the amount of force that is necessary in a particular situation." *Id.*

10      The parties do not dispute that Mr. Rosenblatt was unarmed, and the officers knew that.  But

11    they differ in their accounts of what happened and thus whether Mr. Rosenblatt posed an immediate

12    threat to the safety of the officers or others.

13      On the one hand, Defendants provide admissible evidence that Mr. Rosenblatt refused to comply

14    with repeated police instructions to stay away from his wife and stop trying to intimidate her out of

15    talking to the police.  Defendants also provide admissible evidence showing that Mr. Rosenblatt

16    resisted arrest, slipped out of their grasp, and ran into the house after his wife, and they describe a

17    "split-second decision in a rapidly evolving situation" in a case involving potential domestic

18    violence.  Opposition, ECF No. 44 at 15.  Sergeant Aherne warned Mr. Rosenblatt before using the

19    Taser and says that Mr. Rosenblatt turned around and raised his hands to Sergeant Aherne.  He was

20    concerned that Mr. Rosenblatt posed a danger to the officers and Mrs. Rosenblatt and could get a

21    weapon in the house.

22      On the other hand, Mr. Rosenblatt contradicts Defendants' evidence and offers admissible

23    evidence that he did not pose an immediate threat to the officers or Mrs. Rosenblatt.  Leading up to

24    the arrest, he had been trying to reason with the officers as he asked them to leave his house.  He

25    repeatedly told the officers that they had no right to remain at his house.  Also, they were

26    investigating a crime alleged against his son, who apparently was already in custody in the

27    driveway.  He explains that he was confused by the officers' orders to "go back in the house"

28    because he was standing about a foot inside the doorway.  He also was not trying to intimidate his

UNITED STATES DISTRICT COURT
For the Northern District of California

1  wife and never told her not to talk to the police.  Mr. Rosenblatt testified that he was not combative.

2  *See* Mr. Rosenblatt Depo. at 100-14; Clark Depo. at 102 (Defendants' police practices expert opined

3  that Mr. Rosenblatt was not combative and was trying to get away).

4      As the court said at the hearing, on paper, Defendants' account sounds like an escalation, but the

5  actual recording is reasonably calm with some expressed annoyance or stress or agitation that is not

6  highly emotional.  Certainly the officers gave Mr. Rosenblatt repeated warnings to go into the house

7  or else they would arrest him for interfering with their investigation (meaning their interview of Mrs.

8  Rosenblatt about Nathaniel's threat).  Mr. Rosenblatt responded by reiterating reasonably politely

9  (from the audio recording) that he wanted the officers to leave.  Then, from the recording and

10 everyone's account, after warning him that they would arrest him, the officers told Mr. Rosenblatt to

11 put his hands behind his back because he was under arrest.  Up to this point, the resistance (from

12 both perspectives) is refusal to obey the orders to go into the house.

13     At the point of arrest, the disputed issues of fact are whether Mr. Rosenblatt was outside the

14 house on the patio (police officers) or one foot inside the patio door (Mr. Rosenblatt), whether the

15 officers struggled to cuff him (the officers' account) or whether Sergeant Aherne reached his limit

16 with Mr. Rosenblatt's refusal to comply and yanked him out of the doorway and Mr. Rosenblatt fell

17 (Mr. Rosenblatt's account).  It is at this point that Sergeant Aherne starts telling Mr. Rosenblatt to

18 get down on the ground or he will tase him.  Certainly the warnings about tasing are repeated.  But

19 at this point, Mr. Rosenblatt's behavior – from the recording, Sergeant Aherne's description of it as

20 a "struggle," and Mr. Rosenblatt's own account – could be minimally physically resistant.

21     There also are fact disputes about what happens next.  Mr. Rosenblatt states that he was in a

22 confused state after he fell down onto the patio where he could not see and that he got up and went

23 inside only when the hands released him.  Mrs. Rosenblatt says that she walked into the dining room

24 and immediately turned to the right to go around the dining room table.  Both Rosenblatts say that

25 Mr. Rosenblatt walked (rather than ran, as the officers recount) into the dining room, and went

26 straight (not to the right towards Mrs. Rosenblatt).  Sergeant Aherne worried that Mr. Rosenblatt

27 might get a weapon (a belief that might be more reasonable with running) but again, there is a fact

28 dispute about walking versus running.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Mr. Rosenblatt provides other admissible evidence that he was not an immediate threat to the

2    officers, who outmatched him physically in that they were significantly younger and significantly

3    larger than Mr. Rosenblatt.  Mr. Rosenblatt used the term "linebacker" in his deposition.  Officer

4    Tharp, who was struggling with Mr. Rosenblatt on the patio, was roughly 20 years younger, two

5    inches taller, and 290 to 295 pounds compared to Mr. Rosenblatt's 160 pounds.  Sergeant Aherne

6    was 23 years younger, two inches taller, and 60 pounds heavier.  The officers knew that Mr.

7    Rosenblatt was not armed.  Again, Mr. Rosenblatt disputes that he slipped from the officers' grasp

8    and says that they let go.  He could not see on the patio, and when the hands released him, he went

9    back in his house (as he had been told to do previously).

10    Beyond the Rosenblatts' testimony that they walked and did not run, other admissible evidence

11    shows that Mr. Rosenblatt was not threatening Mrs. Rosenblatt.  During the recording, he appears to

12    implore her (but not in an over the top way) not to report his son (saying, "Carol, uh, please stop this

13    now, Carol") but did not intimidate or threaten her or tell her not to talk to the police.  Also, Mrs.

14    Rosenblatt called 911 because Nathaniel threatened her, not her husband.  All of this can be heard on

15    the recording, which does not sound particularly escalated or emotional, sounds reasonably polite,

16    and shows exasperation by the police, Mr. Rosenblatt, and Mrs. Rosenblatt (up to the point of the

17    attempted handcuffing).

18    Mr. Rosenblatt also contradicts Sergeant Aherne's assertion that he turned and raised his hands

19    towards the Sergeant.  Instead, he says that Sergeant Aherne tased him as he was walking away.

20    Defendants argue that Mr. Rosenblatt could not have been walking away from Sergeant Aherne

21    when he was tased because one of the Taser barbs hit him in the chest.  But Defendants' expert, after

22    he was shown a picture of the dining room table, said that it was plausible that Mr. Rosenblatt could

23    have been walking away from Sergeant Aherne into the house and turned somewhat sideways to get

24    around the dining table.  Just after the incident, Sergeant Aherne told Captain O'Connor over the

25    telephone that he tased Mr. Rosenblatt in the back.  His police report says nothing about the raised

26    hands, and he apparently mentioned that for the first time after the complaint in this case was filed.

27    *See* Aherne Depo. at 46, 50-51.

28    Mr. Rosenblatt also says that Sergeant Aherne did not give a final warning before using the

1   Taser.  The parties also give differing accounts of Sergeant Aherne's justification for at least trying

2   to tase Mr. Rosenblatt a second time.  Sergeant Aherne testifies he was justified in applying the

3   Taser a second time because after taking the first (ten-second) Taser blast, Mr. Rosenblatt tried to

4   get to his knees despite being ordered to remain on the ground.  Mr. Rosenblatt says that he never

5   attempted to get up, rolled on the ground in agony, and would not have been capable of getting to his

6   knees even if he had tried.  There also is an issue about the appropriateness of a ten-second Taser

7   blast.

8       Defendants make a few more points.

9       One, to the extent that Defendants argued at the hearing that repeated disobedience to the order

10   to "put your hands behind your back" meant that tasering was appropriate, the court disagrees based

11   on the factual disputes identified.  If someone is minimally resistant, then an intermediate level of

12   force in the form of the dart gun tasering is not justified under *Bryan v. Macpherson*, 630 F.3d 805

13   (9th Cir. 2010), which is discussed in the next section.

14       Second, Defendants argue that the severity of Mr. Rosenblatt's crimes justified the use of the

15   Taser.  *See* Motion, ECF No. 44 at 19.  Certainly one should not interfere with an attempt to

16   interview someone who made a 911 call about a text threat.  At the same time, Mrs. Rosenblatt was

17   the victim of a threat by Nathaniel, and Mr. Rosenblatt (cut on the head) maybe was too.  *See also*

18   Mrs. Rosenblatt's Deposition, ECF No. 54-11 at 3 (911 call was out of concern for husband's

19   safety).  And regardless, as Defendants acknowledge, the appropriate level of force still turns on

20   physical resistance, *see id.*, which here is disputed.  Similarly, the Defendants argue that Sergeant

21   Aherne warned Mr. Rosenblatt three times that he would tase him if he did not comply with his

22   orders and that the subsequent tasing thus was reasonable and appropriate.  *Id.* at 21.  Again, the

23   reasonable and appropriate quantum of force depends on the resistance, a fact in dispute.  Giving a

24   warning, standing alone, does not justify the subsequent use of a Taser.

25       Third, Defendants say that this was a domestic violence situation, but Mr. Rosenblatt and Mrs.

26   Rosenblatt were the victims of Nathaniel.  As to whether Mr. Rosenblatt was a threat to Mrs.

27   Rosenblatt, as discussed above, there are fact disputes about the walking versus running, and the

28   audio tape alone does not suggest that he was a threat.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

Fourth, Defendants say that no alternative tactics were possible.  In response to whether he could have gone "hands-on" rather than using the Taser, Sergeant Aherne said the following:

> It would have been very difficult with the way that the tables and chairs were to get to the side. We were kind of stuck in a narrow – on the back patio where the hallway was, and I was in font of Jerry [Rosenblatt], and Officer Tharp was behind him. So I couldn't get to the side to use the techniques that we would use to go hands-on to assist Officer Tharp in grabbing him, no.

Aherne Depo at 80.  He also said that he was positioning himself between Mr. Rosenblatt and his wife.  *Id.* at 82.  He could not draw his baton or use pepper spray in the time needed, and the Taser seemed like the best option.  *Id.* at 79.

Defendants argue that given that the officers could not have known what weapons were in the house, the active resistance meant that they had no choice but to use the Taser.  Motion, ECF No. 44 at 22.  But they had no fear previously when they ordered him in the house, and the facts are disputed about what happened on the patio and what Mr. Rosenblatt did when he went in the house.  The pictures of the house and the patio that are in the record do not make it clear one way or another whether there was really no choice.

In sum, these factual disputes (particularly when considered in light of the recording and its general tone) preclude summary judgment and bear directly on whether a reasonable officer could have viewed Mr. Rosenblatt as an immediate threat to the officers or Mrs. Rosenblatt, whether Mr. Rosenblatt actively resisted arrest or instead was verbally noncompliant and at best minimally physically resistant, and whether alternative tactics were available to Sergeant Aherne.  There are different accounts of what happened, and the recording does not contradict (and indeed, is consistent with) Mr. Rosenblatt's account.  Excessive force claims almost always involve disputed facts and credibility determinations, and summary judgment should be granted sparingly.  *See Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003); *Burns v. City of Redwood City*, No. C 08-2995 RS, 2010 WL 3340552, at *8 (N.D. Cal. Aug. 25, 2010) ("Because an excessive force claim 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom,' the Ninth Circuit has also instructed that summary judgment in excessive force cases should be granted sparingly.") (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

The court thus denies Defendants' motion for summary judgment on the first claim.

UNITED STATES DISTRICT COURT
For the Northern District of California

## III.  QUALIFIED IMMUNITY

Defendants assert that even if Sergeant Aherne violated Mr. Rosenblatt's Fourth Amendment right by using excessive force, he is entitled to qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Id*.  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Id*. (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court "mandated a two-step sequence for resolving government officials' qualified immunity claims."  *Id*. at 232.

"First, a court must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right."  *Id*. (citing *Saucier*, 533 U.S. at 201).  This part of the inquiry "mirrors the substantive summary judgment decision on the merits."  *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).  "If no constitutional right would have been violated were the allegations established," then the officer is entitled to qualified immunity.  *Saucier*, 533 U.S. at 201.

"Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Pearson*, 555 U.S. at 232.  "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right."  *Id*. (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).[9]

---

[9] The Supreme Court has stated that the order in which these questions are addressed is left to the lower court's discretion.  *Pearson*, 555 U.S. at 236 ("[W]hile the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in

1      As to step one, as noted above, material issues of fact exist regarding whether Sergeant Aherne

2  used objectively reasonable force in tasing Mr. Rosenblatt.

3      As to step two, "the relevant, dispositive inquiry in determining whether a right is clearly

4  established is whether it would be clear to a reasonable officer that his conduct was unlawful in the

5  situation he confronted." *Saucier*, 533 U.S. at 202; *see also Walker v. Gomez*, 370 F.3d 969, 978

6  (9th Cir. 2004).  This inquiry "must be undertaken in light of the specific context of the case, not as

7  a broad general proposition." *Saucier*, 533 U.S. at 201.  "This is not to say that an official action is

8  protected by qualified immunity unless the very action in question has previously been held

9  unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

10  *Anderson*, 483 U.S. at 640.

11      An issue here is whether the law regarding the use of Tasers in dart mode was clearly established

12  on August 20, 2011.  The relevant case is *Bryan v. Macpherson*, 630 F.3d 805 (9th Cir. 2010).  In

13  *Bryan*, the Ninth Circuit held that Officer MacPherson violated Bryan's constitutional right to be

14  free from excessive force by using a Taser X26 in dart mode to get Bryan to comply with his orders,

15  *id.* at 832, and that the use of a Taser in dart mode was an "intermediate, significant level of force

16  that must be justified by the governmental interest involved," *id.* at 826.  Officer MacPherson had

17  stopped Bryan's car for a seatbelt infraction.  Bryan pulled over, put his car in park, and stepped out.

18  He "was agitated, standing outside his car, yelling gibberish and hitting his thighs, clad only in his

19  boxer shorts and tennis shoes." *Id.* at 822.  He did not threaten the officer, was standing 20 to 25

20  feet away and was not attempting to flee.  *Id.*  Bryan complied with Officer MacPherson's

21  instructions except the one to stay in his car, but that was not "active resistance" supporting the use

22  of the Taser.  *Id.* at 829-30.  In reaching its conclusion that the use of force was not reasonable, the

23  court also noted Officer MacPherson's failure to warn Bryan that he would be shot with the Taser

24  and failure to consider other tactics to effect arrest.  *Id.* at 831.  The court nonetheless found that

25  Officer MacPherson was entitled to qualified immunity because the law was not clearly established

26

27  _____

28  deciding which of the two prongs of the qualified immunity analysis should be addressed first in
light of the circumstances in the particular case at hand.").  That said, the Supreme Court also
believes that the order used in *Saucier* "is often beneficial." *Id.*

ORDER (C 12-05210 LB)            23

UNITED STATES DISTRICT COURT
For the Northern District of California

1    in July 2005 that use of a Taser X26 in dart mode was an intermediate level of force.  *Id.* at 833.

2           Here, Sergeant Aherne argues that *Bryan* is factually distinguishable.  "[W]hile *Bryan* is

3    instructive when an unarmed suspect is not resisting arrest and has not created any belief in the

4    officer's mind that he might be violent, it would not put a reasonable officer on notice as to whether

5    use of a Taser is or is not appropriate when dealing with a suspect who has physically resisted police

6    and is fleeing from them with unknown intentions all while in the context of a domestic violence

7    situation."  Motion at 26.  While that may be so, Defendants' argument relies on their version of the

8    facts.  But as described above, there are genuine issues of material fact regarding Mr. Rosenblatt's

9    level of resistance to the officers, whether he was following his wife into the house, and whether Mr.

10   Rosenblatt advanced towards Sergeant Aherne.  Resolving these factual disputes is necessary to the

11   determination of whether use of a Taser was lawful under the facts here.  Under Mr. Rosenblatt's

12   version of the facts, he was at worst minimally resistant, and use of the intermediate level of a Taser

13   in dart mode in the back would have been clearly unconstitutional.

14          Defendants also point to *Black v. City of Vallejo*, No. 2:12-CV-1439 GEB DAD, 2013 WL

15   2245385 (E.D. Cal. May 21, 2013), where the district court granted the officer defendant judgment

16   on the pleadings after he used a Taser in dart mode to subdue a suspect.  *See* Motion at 26-27; *Black*,

17   2013 WL at *7.  But that holding hinged on the officer's investigating a felony where the suspect

18   was fleeing.   The facts involving Mr. Rosenblatt are different and disputed as to whether he was

19   fleeing or at worst minimally resistant.

20          In sum, the issues of disputed fact preclude a determination at this point that Sergeant Aherne is

21   entitled to qualified immunity.  *See Santos*, 287 F.3d at 855 n.12 (9th Cir. 2002) (noting that it was

22   "premature" to decide whether qualified immunity shielded officers from a excessive force claims

23   "because whether the officers may be said to have made a 'reasonable mistake' of fact or law [ ] may

24   depend on the jury's resolution of disputed facts and the inferences it draws therefrom"; "Until the

25   jury makes those decisions, we cannot know, for example, how much force was used, and, thus,

26   whether a reasonable officer could have mistakenly believed that the use of that degree of force was

27   lawful."); *Burns*, 2010 WL 3340552, at *12 ("Just as the question of whether a constitutional

28   violation occurred here turns entirely on whose facts to accept, so too does the question of

1    immunity.  More simply, if [plaintiff] behaved as the officers contend, their mistake of fact might be

2    objectively reasonable.  If he did not, the mistake may be deemed unreasonable.").

3    **IV.  MR. ROSENBLATT'S STATE LAW TORT CLAIMS**

4        Defendants move for summary judgment on Mr. Rosenblatt's state law tort claims, arguing that

5    the reasonableness standard that applies to Mr. Rosenblatt's federal excessive force claim also

6    applies to the state law claims.  *See* Motion at 27-28 (discussing holding in *Hernandez v. City of*

7    *Pomona*, 46 Cal. 4th 501 (2009)); *see also Arpin v. Santa Clara Valley Transportation Agency*, 261

8    F.3d 912, 922 (9th Cir. 2001) (under California law, claims for assault and battery for excessive

9    force during arrest require plaintiff to show that the use of force was unreasonable under the Fourth

10   Amendment standard).  Because Mr. Rosenblatt's excessive force claim survives summary

11   judgment, however, so do his state law tort claims.  Accordingly, the court denies Defendants'

12   motion as to claims four through nine.

13   **V.  MR. ROSENBLATT'S SUPERVISORY LIABILITY AND *MONELL* CLAIMS**

14       Mr. Rosenblatt asserts that the Town of Hillsborough and former Chief O'Connor developed

15   unconstitutional policies regarding Taser use that led to Sergeant Aherne's use of excessive force,

16   former Chief O'Connor ratified Sergeant Aherne's allegedly unconstitutional acts, and Hillsborough

17   is liable under *Monell*.  *See* SAC, ECF No. 30, ¶¶ 22-25.

18       Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official

19   policy or custom causes a constitutional tort.  *See Monell*, 436 U.S. at 690.  A city or county may not

20   be held vicariously liable for the unconstitutional acts of its employees under the theory of

21   *respondeat superior*.  *See Board of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Monell*,

22   436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995).  To impose

23   municipal liability under section 1983 for a violation of constitutional rights, a plaintiff must show

24   the following: (1) the plaintiff possessed a constitutional right of which he or she was deprived; (2)

25   the municipality had a policy; (3) this policy amounts to deliberate indifference to the plaintiff's

26   constitutional rights; and (4) the policy is the moving force behind the constitutional violation.  *See*

27   *Plumeau v. School Dist. # 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

28       Liability based on a municipal policy may be satisfied in one of three ways: (1) by alleging and

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

showing that a city or county employee committed the alleged constitutional violation under a

formal governmental policy or longstanding practice or custom that is the customary operating

procedure of the local government entity; (2) by establishing that the individual who committed the

constitutional tort was an official with final policymaking authority, and that the challenged action

itself was an act of official governmental policy which was the result of a deliberate choice made

from among various alternatives; or (3) by proving that an official with final policymaking authority

either delegated policymaking authority to a subordinate or ratified a subordinate's unconstitutional

decision or action and the basis for it.  *See Fuller*, 47 F.3d at 1534; *Gillette v. Delmore*, 979 F.2d

1342, 1346-47 (9th Cir. 1992).

**A. Hillsborough Police Department Policy**

Defendants move for summary judgment, arguing that the Taser policy is consistent with case

law and did not cause any constitutional violation.

Policy 309 permits officers who have completed the HPD's training to use the Taser:

> when circumstances known to the individual officer at the time indicate that the application of the Taser is reasonable to subdue or control:
>
> (a) A violent or physically resisting subject, or
>
> (b) A potentially violent or physically resisting subject if:
>
>> (1) The subject has verbally or physically demonstrated an intention to resist; and
>>
>> (2) The officer has given the subject a verbal warning of the intended use of the Taser followed by a reasonable opportunity to voluntarily comply; and
>>
>> (3) Other available options reasonably appear ineffective or would present a greater danger to the officer, the subject or others.

Snell Decl. Ex. 23, ECF No. 54-26 at 3, 5; *see* Opp'n, ecf No. 54 at 27-29.

Defendants move for summary judgment on the basis that the policy is consistent with case law.

Motion at 28-29.  They focus on the "potentially violent" language in the policy and argue that it

comports with *Bryan v. Macpherson*.  Plaintiffs respond that by its plain language, policy 309

permits an officer to use a Taser on a subject for simply demonstrating an intent to physically resist

the officer when other available options reasonably appear ineffective, so long as the officer gives a

UNITED STATES DISTRICT COURT
For the Northern District of California

1  verbal warning and an opportunity to comply.  Opposition, ECF No. 54 at 28 (citing *Gravelet-*

2  *Blondin v. Sherlton*, 728 F.3d 1086 (9th Cir. 2013).  In reply, Defendants argue that Mr. Rosenblatt

3  provides no evidence that the policy caused the constitutional deprivation.  Reply, ECF No. 55 at 16.

4       *Gravelet-Blondin* involved a policy that defined Tasers as low-level of force, lower than any

5  hands-on force including a firm grip.  *Id.* at 1096.  The policy here is different and by its plain

6  language requires actual resistance or potential violence or resistance.  It also requires warnings and

7  consideration of alternatives.  That being said, under the plain language of the policy, officers may

8  use the taser to subdue a "potentially . . . physically resisting subject" who "verbally . . .

9  demonstrates an intention to resist" so long as there is a warning and an opportunity to comply and

10 "other available options reasonably appear ineffective . . . ."  Depending on the particular facts,

11 using a Taser on such a subject could be constitutionally unreasonable if the subject is only

12 potentially resistant and has just verbally demonstrated an intent to resist.  As described above, it is

13 not constitutionally permissible to use a Taser in dart mode (an intermediate level of force) on a

14 minimally resistant person.  It is not enough to warn someone and then use the Taser if the force is

15 not reasonable under the circumstances.  A "verbal intent to resist" also is pretty vague and could be

16 many things.

17      In their reply, Defendants argue that Mr. Rosenblatt provides no evidence that the policy caused

18 the constitutional deprivation.  Reply, ECF No. 55 at 16.  The idea is that Sergeant Aherne justified

19 his use of force by Mr. Rosenblatt's refusal to comply with lawful orders, resistance, and attempts to

20 intimidate and threaten his wife, all in the context of a 911 call.  If those facts are accurate, then

21 arguably there is no constitutional violation from the use of intermediate force and probably

22 qualified immunity would apply in any event.  That means the facts – one way or another – drive the

23 determination as to whether the force was unreasonable, and that in turns means that the policy did

24 not cause any violation

25      In the end, the court's view is under these disputed facts, there is an argument that the policy

26 caused Sergeant Aherne to use a Taser against Mr. Rosenblatt under conditions that amount to an

27 excessive force.  The record is not developed enough for the court to conclude as a matter of law

28 that summary judgment is appropriate.

UNITED STATES DISTRICT COURT
For the Northern District of California

### B. Ratification of Sergeant Aherne's Use of Force

Mr. Rosenblatt also argues that the post-incident review amounted to ratification of Sergeant Aherne's actions.  Opp'n at 28-29.

"To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.'"  *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)); *Gillette*, 979 F.2d at 1348 (refusing to find ratification, because "[t]here is no evidence that the City manager made a deliberate choice to endorse the Fire Chief's decision and the basis for it")).  "Ordinarily, ratification is a question for the jury."  *Christie v. Iopa*, 176 F.3d 1231, 1238-39 (9th Cir. 1999) (citation omitted)).  "However, as with any jury question, a plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification occurred."  *Id*. at 1239 (citation omitted).

Here, former Captain (and now Chief) Mark O'Connor reviewed the incident and determined that Sergeant Aherne's use of forces was appropriate based on the facts reported to him, facts that involved resistance, struggle, and witness threats.  *See* O'Connor Depo. at 16, Snell Decl. Ex. 24, ECF No. 54-27 at 5.  Captain O'Connor testified that his understanding at the time was that a Taser could be used based on the same level of justification as control holds or pain compliance by hand. *Id.* at 26.  He reported to then-Chief Matt O'Connor that the use of force was appropriate based on the recordings, and the Chief responded, "okay."  *Id.* at 14-16.  Sergeant Aherne reviewed and approved his own report about the use of force, in accordance with HPD policy.  Aherne Depo. at 11-15.

As with the *Monell* claim, there was a policy that – at least on the record here – arguably permitted officers to use their X26 Tasers in dart mode on subjects who are only minimally resistant. There also is a material dispute of fact about whether the policy caused the violation and whether Defendant O'Connor ratified Sergeant Aherne's conduct.  This precludes summary judgment.

## VI. THE BANE ACT CLAIM

Defendants also move for summary judgment on Mr. Rosenblatt's claim under the Bane Act, California Civil Code § 52.1.  The Bane Act prohibits interference or attempted interference with a person's rights under federal or California law by "threats, intimidation, or coercion." Cal. Civ.

Code § 52.1(a).  "[W]here an arrest is otherwise lawful, a Bane Act claim based on excessive force "also requires violation of some right other than the plaintiff's Fourth Amendment rights."  *Bender v. County of Los Angeles*, 217 Cal. App. 4th 968, 978 (Cal. App. 2d 2013).  But where "an arrest is unlawful *and* excessive force is applied in making the arrest, there has been coercion 'independent from the coercion inherent in the wrongful detention itself' – a violation of the Bane Act."  *Id.*

As with the federal civil rights claim, material questions of fact preclude resolution as a matter of law as to whether the arrest and use of force were lawful.  The court denies Defendants' motion for summary judgment on the Bane Act claim.

## CONCLUSION

The court denies Defendants' summary judgment motion. This disposes of ECF No. 44.

**IT IS SO ORDERED.**

Dated: November 12, 2013

LAUREL BEELER
United States Magistrate Judge